*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BOSQUETT & COMPANY,

        Plaintiff-Appellee/Cross-Appellant,

v

STERLING BENEFITS LLC,

        Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
January 14, 2020

No. 345615
Macomb Circuit Court
LC No. 2016-000218-CB

Before: RIORDAN, P.J., and SAWYER and JANSEN, JJ.

PER CURIAM.

Following a bench trial, defendant Sterling Benefits LLC ("Sterling") appeals as of right the trial court's order that plaintiff Bosquett & Company ("Bosquett") is entitled to money damages and statutory interest on its breach of contract claim against Sterling. Sterling also appeals the trial court's grant of additional damages to Bosquett. Bosquett has cross-appealed on those same issues. For the following reasons, we affirm the trial court.

## I. FACTS & PROCEDURAL HISTORY

This case arises out of the sale of a business. Bosquett was an insurance agency owned by David Fischer. In 2009, Fischer sold Bosquett to Sterling, a company owned by Joe Haney and Paul Mattes, in what Fischer described as a "fire sale." The parties entered into an asset purchasing agreement (the "APA") on September 4, 2009. Under the terms of the contract, Sterling agreed to pay Bosquett for certain assets. In particular, this dispute involves Bosquett's personal lines of business, commercial lines, and a benefits book. Each of these items represents a revenue stream of commissions generated by Bosquett's book of business.

Regarding the personal lines, Sterling agreed to pay $350,000 total, with $150,000 due up front and the remaining $200,000 payable over two years in $50,000 installments every six months. Each of those installments was conditioned on Sterling meeting a certain "benchmark." This benchmark required that certain accounts be reviewed and if more than 88% of those accounts were retained, then Sterling would pay the installment, but if less than 70% of the benchmark was retained, then no such payment was due, and the purchase price was reduced by

this $50,000.00. The APA also provided that Bosquett was "entitled to regular reports from carriers as to commissions received by [Sterling] in connection with the purchased books."

Regarding the commercial lines and benefits book, the APA provided that Sterling would pay Bosquett in the following manner:

> 45% of commissions actually received for any type of insurance sold to customers from the Commercial Book and 35% of commission actually received for any type of insurance sold to customers in the Benefits Books by [Sterling] during the subsequent three (3) years, based on the Commercial Book and the Benefit Book as determined from insurance provider reports for the year preceding September 1, 2009.

Bosquett filed a complaint in January 2016, alleging breach of contract and requesting an accounting and specific performance of the contract.[1] Bosquett contended Sterling breached the APA by failing to pay it as agreed despite the achievement of the APA's benchmarks, by failing to provide periodic reports pursuant to the APA, and by failing to pay commissions on the commercial lines and benefits book.

At trial, the parties presented evidence regarding the value of the benchmark. Sterling contended that the benchmark value was $800,000 based on the book of business report provided by Bosquett during negotiations. Bosquett maintained that the benchmark was $315,000 based on the summary page for Bosquett's personal lines business in the 14 months before the sale, which was provided to Sterling at closing. In addition, the trial court considered Sterling's internal reports demonstrating the amount of business that was generated from Bosquett's former clients.

Fischer testified that he sold Bosquett to Sterling because his license was being suspended and he wanted to ensure that his clients had continuity of coverage. During negotiations with Sterling, Bosquett provided a "book of business report" in order to give Sterling an approximation of the volume of Bosquett's clients. He said that at the time of the sale, the benefits book business size alone was worth between $30,000 to $80,000 and it was impossible for that business to drop to zero overnight. Fischer testified that he never received notice from Sterling that the benchmarks had not been met, that there were any claims against his errors and omissions coverage, or that the commercial line clients had left Sterling. Fischer reviewed the reports that Sterling had submitted as evidence of the commissions on the commercial lines and he believed that the reports were incomplete. Several months after closing, Fischer also testified, he received a Bosquett phone bill of $10,000, which he paid at his attorney's behest. However, he believed that Sterling was obligated to repay him.

---

[1] Bosquett initially filed a complaint in 2012, which was dismissed without prejudice in August 2014, due to a conflict of interest by Bosquett's attorney.

Sterling's Haney testified that he ran reports on the commissions generated on the personal lines and Sterling did not hit any of the benchmarks. Haney admitted that the book of business report was inaccurate and that the numbers that were included on many of the line items to get to $800,000 "were simply wrong." Regarding the commercial lines, Haney could not recall generating any reports, but he believed that Sterling did not owe Bosquett any payments. Internal reports by Sterling, however, demonstrated that it had received over $143,000 on commissions from former Bosquett clients. Haney explained that no money was owed on these commissions because they were actually not Bosquett's clients. Several Bosquett employees transferred to Sterling as independent contractors at the time of the sale, and accordingly to Haney, the clients associated with these "producers" were not Bosquett's clients because they belonged to the producers. Additionally, some of Bosquett's former clients had left Sterling, but had returned after concerted efforts by Sterling and therefore they no longer could be classified as belonging to Bosquett. Other clients had left Sterling and were owed a refund, which Sterling took out of the money owed to Bosquett.

Haney further testified that one client in particular, Hartford, believed that Bosquett owed Hartford money, and Sterling had made a separate deal with Hartford allowing it to keep some portion of commissions otherwise due to Sterling as a payment on Bosquett's behalf. Another client, Wireless Vision, had been listed as an excluded asset in the APA because, at the time of the sale, Sterling was a small company and had not intended to purchase that relatively large account, but had intended instead for it to stay with the producer who was servicing that client, Patrick Parke. However, Sterling's internal reporting system had designated Wireless Visions as a Bosquett client through a clerical error.

Mattes also testified that Sterling "never came close" to hitting the benchmark on the personal lines, but admitted that Sterling's reports might be inaccurate. Regarding the commercial lines, Wireless Vision had been listed as an excluded asset because it was Parke's book of business and Sterling did not have enough money at the time of the sale to buy Bosquett's book of business along with Parke's account. While Fischer initially helped Sterling try to retain clients, Mattes said that Fischer stopped returning calls and emails. Due to Fischer's lack of cooperation, Mattes believed that Bosquett was not entitled to any portion of the commissions on the commercial lines.

Barry Paulsell, who worked selling insurance at Bosquett and then Sterling, testified that he maintained his own book of business during his transition from Bosquett to Sterling, and his accounts were not Bosquett's to sell. However, Paulsell admitted that most of the benefits accounts were his, but "there were identifiable cases that were benefits to Bosquett." Paulsell also admitted that he had an outstanding debt he owed to Sterling for approximately $37,000.

The trial court awarded Bosquett $162,678.37 in connection with its claims and statutory interest. The trial court held that the benchmark was $315,243.75, but because Bosquett did not provide evidence that the benchmark had been met, it failed to establish that it was entitled to recover any additional sums in connection with the personal lines.

The trial court further held that, although the APA provided that Bosquett was entitled to certain reports, it did not place any burden on Sterling to furnish them, and because the parties had similar access to that information, Bosquett was not entitled to relief on this claim. The trial

court then turned to the issue of the commercial lines and the benefits book. It determined that, contrary to Sterling's assertions, the commissions were not contingent on Bosquett's assistance in retaining the accounts. The unrebutted evidence showed that 45% of the total commissions, reduced by the $50,000 already paid, totaled $228,672.06. The trial court reduced this amount by subtracting $65,993.69 to reflect the excluded Wireless Vision account. It rejected Sterling's argument that the amount should be further reduced by the exclusion of the Hartford account due to Hartford's allegations that Bosquett had breached an agreement with Hartford. The trial court reasoned that because the APA required Sterling to notify Bosquett of Hartford's allegations, and allow Bosquett to defend the claim, and because Sterling failed to do so and had settled the claim with Hartford instead, Sterling breached the APA, and therefore, was not entitled to a reduction. For this same reason, i.e., failure to notify, the trial court rejected Sterling's argument that it was not required to pay commissions in connection with the Asmar account due to Bosquett's debts owed on that account. The trial court also rejected Sterling's argument that it was not required to pay commissions on accounts managed by independent contractors or lapsed accounts because the accounts were listed in the APA, and Sterling failed to identify any exception that would apply anywhere in the APA. Bosquett also was denied damages in connection with the benefits book because it failed to provide evidence establishing that any commissions were owed.

Bosquett's claim that Sterling was required to reimburse it for a $10,000 phone bill was denied because Bosquett failed to provide evidence that it had actually paid the bill and that Sterling had any obligation to repay it. Finally, the trial court denied Bosquett's request for $200,000 in precomplaint interest pursuant to the terms of the promissory note as incorporated into the APA. The trial court found that the APA only provided for payment of this sum in connection with the personal lines, and because Bosquett failed to establish that it was entitled to payment for the personal lines, it was not entitled to this sum either. Both Bosquett and Sterling sought to recover attorney fees, and the APA provided for such recovery by the prevailing party. Because Sterling was obligated to pay Bosquett a substantially lesser amount than what Bosquett had sought, the trial court determined that neither party had prevailed and neither party was entitled to have the other pay its attorney fees.

Bosquett moved for a new trial, and alternatively, to amend the judgment pursuant to MCR 2.116(A)(2)(c). The trial court denied the motion for a new trial, but granted in part Bosquett's motion to amend the judgment. The trial court found that the APA did not provide for the exclusion of the Wireless Vision account in its entirety as expressed by the plain language of the agreement, and as evidenced by the conduct of the parties. It therefore found that Bosquett was entitled to recover $65,993.69 in connection with that account, plus statutory interest. The trial court denied Bosquett's claims regarding the personal lines, pre-judgment interest, and attorney fees.

Bosquett requested case evaluation sanctions pursuant to MCR 2.403(O). Sterling conceded that Bosquett was entitled to sanctions, but disputed the reasonableness of the requested attorney fees. After reviewing the factors set forth in *Smith v Khouri*, 481 Mich 519, 529; 751 NW2d 472 (2008), the trial court granted Bosquett's motion, but reduced the sanction amount for attorney fees to $46,907.50, from the requested amount of $119,867.50.

This appeal followed on the issues of whether the trial court committed error requiring reversal regarding the amounts payable for (1) the personal lines, (2) the commercial lines and benefits book, (3) precomplaint interest, and (4) attorney fees.

## II. STANDARD OF REVIEW

Questions involving the proper interpretation of a contract or the legal effect of a contractual clause are reviewed de novo, *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008), as are the interpretation and application of court rules, *Kernen v Homestead Dev Co*, 252 Mich App 689, 692; 653 NW2d 634 (2002). However, whether to award precomplaint interest as an element of damages is a discretionary decision to be made by the trier of fact and is reviewed for an abuse of discretion. *Militzer v Kal-Die Casting Corp*, 41 Mich App 492, 496–97; 200 NW2d 323 (1972).

## III. PERSONAL LINES

Bosquett argues that the trial court committed error requiring reversal when it held that Bosquett was not entitled to any payments in connection with the personal lines. We disagree.

The goal in contract interpretation is to give effect to the intent of the parties, which is determined first and foremost by the plain and unambiguous language of the contract itself. *Kendzierski v Macomb Co*, 503 Mich 296, 311-312; 931 NW2d 604, 612 (2019). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Id.* "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *Id.* "A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Id.* (quotation marks and citations omitted, emphasis in original).

The terms of the APA are unambiguous. Article 1.4 states in relevant parts:

(a) The price to be paid for the Purchased Assets ("Purchase Price") prior to adjustment is [$350,000], based primarily on personal lines commissions (the "Personal Lines Book") received by [Bosquett] for the year immediately preceding August 1, 2009 ("Benchmark") as evidenced by the commission statement and production reports of the carriers as adjusted on audit by carriers excluding only those policies sold to clients who have advised [Bosquett] that the client will not be renewing the policies, as further adjusted below.

(b) The Purchase Price (and Note) shall be adjusted post-Closing based upon a proportionate decrease related to the percentage decrease in retention of the amount of commissions received by [Sterling] from the Personal Lines Book during the subsequent 24 months from August 1, 2009. In addition to the $100,000 paid at closing and the $50,000 paid after disclosures are made, four additional [$50,000] payments may be made, one every six months, subject to a possible adjustment based upon a retention rate as of the date of the installment. There shall be no adjustment made if the retention rate exceeds 88% of the

Benchmark as of the first and second installment and 85% of the Benchmark as of the third and fourth installments. However if the retention rate falls below 70% on any installment date, then no payment shall be made for that period and the amount shall represent a reduction in the Purchase Price. . . . .

The only dispute is whether the four payments of $50,000 were required under the APA. The APA clearly states that no payment is required "if the retention rate falls below 70% [of the benchmark] on any installment date." The trial court correctly concluded that whether the benchmark was properly set at $800,000 or $315,000 was immaterial because Bosquett presented no evidence that the benchmark had been met at all.

Bosquett contends the trial court improperly placed the burden of proof on it because it was in Sterling's interest to prove that a downward adjustment was applicable and because Sterling was the only party with access to the relevant reports regarding the benchmark. This argument fails because, as the trial court correctly noted, a plaintiff bears the burden of establishing the elements of its claim. *AFT Michigan v Michigan*, 303 Mich App 651, 660; 846 NW2d 583 (2014). Here, Bosquett claimed a breach of the APA, but submitted no evidence that the benchmark was ever met, which would trigger Sterling's requirement to pay. Bosquett's failure to present evidence that the benchmark had been met is fatal to its claim.

Bosquett also argues its only obligation was to sit back and wait for either a payment, or a reason for nonpayment. However, this assumes that Sterling had a duty to make periodic reports to Bosquett. As the trial court correctly held, the APA imposes no such reporting requirement. Section 1.4(g) of the APA merely states that Bosquett "shall be entitled to regular reports from carriers as to commissions received by [Sterling] in respect to the purchased books." The "regular reports from carriers" more reasonably indicates that Bosquett could approach the carriers directly and request commission reports, rather than rely on reporting from Sterling. Nothing in that section, or any other section in the APA, imposes on Sterling the sort of reporting obligation proposed by Bosquett. We cannot "look past the plain and unambiguous terms of a contract to impose an obligation on a party that has not been clearly delineated in the parties' agreement." *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 549; 904 NW2d 192 (2017).

Additionally, Bosquett argues that it produced evidence that the benchmarks had been met for two of the six-month periods. However, as the trial court properly recognized, those reports included accounts that were not within the purview of the APA as evidenced by the book of business, and once those sums were subtracted, the totals were insufficient to meet the benchmark for those periods. Bosquett contends the reason those reports could be deemed unreliable was because Sterling produced them after-the-fact and late during the discovery period. However, the trial court was aware of the nature of the reports, and when they were produced and found that Bosquett provided no evidence to rebut them. Bosquett now argues that it did not have a chance to address this evidence due to Sterling's "sandbagging" and submitting this evidence in a post-trial brief. However, all of the exhibits, including the reports at issue, that the trial court relied on were properly admitted during the bench trial. Therefore, Bosquett's argument is unpersuasive.

Accordingly, the trial court did not err when it found that Bosquett was not entitled to relief on this issue because it failed to present evidence that the benchmark had been met.

## IV.  COMMERCIAL LINES AND BENEFITS BOOK

The parties contend that the trial court erred when it calculated the commissions due to Bosquett in connection with the commercial lines and the benefits book.  We consider the arguments in turn, and reject them all.

First, Sterling argues that payment of commissions was conditioned on Fischer's assistance with retaining existing customers, which is not a requirement included in the APA.  Section 1.7 states:

> [Fischer] will also assist [Sterling] in the transition of [Bosquett's] clients and their existing Business to [Sterling] and generally retain the commercial and benefits insurance business (the "Commercial Book" and the "Benefits Book"). During the three (3) years period, ending August 31, 2012, [Sterling] will compensate [Bosquett] in all amount equal to 45% of commissions actually received for any type of insurance sold to customers from the Commercial Book and 35% of commissions actually received for any type of insurance sold to customers in the Benefit Book by [Sterling] during the subsequent three (3) years, based on the Commercial Book and the Benefits Book as determined from insurance provider reports for the year preceding September 1, 2009.  … Payments for commercial and benefits accounts retained shall be based on audited insurance provider reports. . . . Commissions earned hereunder before August 31, 2012, shall be payable to [Bosquett] if received within ninety (90) days.  Any adjustment up or down will be retained by [Sterling].

Although Sterling argues that it would have been in Bosquett's best interest for Fischer to provide assistance, and section 1.7 places on Fischer an obligation to assist, Fischer's assistance is not a precondition for payment of the commissions from Sterling to Bosquett.  Thus, the trial court did not err in its interpretation of the APA.

Next, Sterling contends that the trial court erred when it amended its judgment to not exclude the Wireless Vision account in its entirety.  Schedule 1.2 lists the excluded assets as follows:

Wireless Vision, LLC

> Commissions associated with this account, **if consummated**, shall be assigned to Patrick F. Parke, who is currently employed by [Sterling]. However, [Sterling] will be responsible for delinquent amounts owed to Auto Owners Insurance, to a maximum amount of [$9,000].  An amount paid in excess of the maximum amount shall be offset against payments to [Bosquett].

Customers in the Personal Lines Book Insured by Chubb Group of Insurance Companies.

All tangible personal assets of [Bosquett] except the data storage server.

Causes of action and claims against Gordon St. John, Conrad Conti, Craig Aiken, Jill Presley, Karen Brody and the Ralph C. Wilson Agency for breach of noncompete agreements, overpayments and tortious interference except for the right to obtain injunctive relief for breach of noncompetition agreements which will be held jointly and severally by [Bosquett] and [Sterling]. [Emphasis added.]

Although Wireless Vision appears on the schedule as an excluded asset, the description immediately following the entry indicates that the parties contemplated that Wireless Vision would transfer to Sterling, and that in that event, "if consummated," the commission "shall be assigned to [Parke]." Thus, there is textual support in the APA for the trial court's conclusion that Wireless Vision was not intended to be excluded in its entirety. Sterling's suggested interpretation, that the entire commission was meant to go to Parke, also is reasonable. However, even if this were sufficient to create an ambiguity, the trial court properly resolved it by considering the conduct of the parties, e.g., the status of the other listed assets on schedule 1.2. See *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004) (a contract is ambiguous when a term "is *equally* susceptible to more than a single meaning") (emphasis in original); *Shay v Aldrich*, 487 Mich 648, 660; 790 NW2d 629 (2010) ("[I]f the language of a contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties."); *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 470; 663 NW2d 447 (2003) (where the language of the contract is ambiguous, to aid in ascertaining the parties' intent, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice) (citation omitted).

Next, Sterling argues that the trial court erred when it included the Hartford account in the commercial lines because Bosquett did not have the authority to sell this account, and because the trial court's decision results in an unfair outcome. As the trial court noted, the APA provided an avenue for Sterling to seek recovery for Hartford's claim against Bosquett. Specifically, section 7.2 required Sterling to notify Bosquett of any claim and allow Bosquett to defend the claim. It is undisputed that Sterling failed to properly notify Bosquett, and Sterling cannot now complain that it suffers an unfair result due to its own failure to adhere to the terms of the APA.

Next, Sterling argues that Bosquett failed to carry its burden that it was entitled to the commissions. The APA permits Bosquett to request the carrier reports directly from the insurance companies, and Sterling contends that Bosquett failed and/or refused to obtain the reports, and therefore, failed to carry its burden. Indeed, section 1.7 requires that "[p]ayments for commercial and benefits accounts retained shall be based on audited insurance provider reports." However, the trial court relied on reports provided by Sterling, which demonstrated that Sterling received payments subject to the 45% commission agreement under the APA. Despite the admission by Mattes that Sterling's records might be inaccurate, the reports nonetheless demonstrated that Sterling received payments subject to the 45% commission under the APA and Sterling cannot now rely on that evidence to avoid its liability. Additionally, the

APA requires that the payments must be "based on audited insurance provider reports" but that does not limit the trial court to considering *only* those types of reports. Rather, it was within the province of the trial court to conclude that Sterling's reports were also "based on audited insurance provider reports."

Bosquett argues that the trial court erred in concluding that it did not produce evidence regarding the benefits book because Fischer testified that this business represented by the benefits book accounted for $30,000 to $80,000 annually before the sale, and that it was impossible for this amount to reach $0 after closing. Further, Paulsell testified that "there were identifiable cases that were benefits of Bosquett" in the benefits book. When evaluating the trial court's factual findings, we defer to the trial court's superior ability to judge the credibility of the witnesses who appeared at trial. *Brooks v Rose*, 191 Mich App 565, 570; 478 NW2d 731 (1991). Although Bosquett correctly notes that the trial court received some testimony regarding the benefits book, it clearly did not find that testimony credible. We will not disturb that credibility determination.

Accordingly, the trial court did not commit error requiring reversal when it calculated the amount of commissions owed to Bosquett with regard to the commercial lines and the benefits book.

## V. PRETRIAL INTEREST

Bosquett argues that the trial court erred when it denied Bosquett's request for precomplaint interest. We disagree.

> Michigan has long recognized the common-law doctrine of awarding interest as an element of damages. The doctrine recognizes that money has a "use value" and interest is a legitimate element of damages used to compensate the prevailing party for the lost use of its funds. Furthermore, the decision whether to award interest as an element of damages is not dependent upon a contractual promise to pay interest.... [T]he pivotal factor in awarding such interest is whether it is necessary to allow full compensation. [*Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 499; 475 NW2d 704 (1991) (citations omitted).]

The trial court declined to award any precomplaint interest due to Bosquett's delay in bringing this action. Although the court had no discretion regarding interest after the date the complaint was filed, we find no abuse of discretion in the denial of precomplaint interest as an element of damages, particularly when plaintiff delayed in filing suit for almost a year and a half from the dismissal of its initial complaint.

## VI. ATTORNEY FEES

Bosquett argues that the trial court improperly denied its request for attorney fees pursuant to the terms of the APA. We disagree.

Attorney fees are generally not recoverable as costs from the losing party in the absence of a statute or court rule authorizing an award of attorney fees. *Haliw v Sterling Hts*, 471 Mich

700, 706-707; 691 NW2d 753 (2005). However, an exception exists when parties specifically contract for the payment of attorney fees. *Grace v Grace*, 253 Mich App 357, 370-371; 655 NW2d 595 (2002); *Watkins v Manchester*, 220 Mich App 337, 342; 559 NW2d 81 (1996). When the provisions of a contract specifically contemplate attorney fees, they become part of the damages awardable under the contract for breach of the contract. *Central Transport, Inc v Fruehauf Corp*, 139 Mich App 536, 548-549; 362 NW2d 823 (1984).

In this case, section 8.11 of the APA provides:

> In the event any suit of other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the parties agree that the prevailing party or parties shall be entitled to recover from the other party or parties upon final judgment on the merits reasonable attorney fees ....

The parties dispute whether Bosquett is a "prevailing party" under the APA. The contract does not define the term, and we must therefore give the term its ordinary meaning. *Barton-Spencer v Farm Bureau Life Ins Co of Michigan*, 500 Mich 32, 39; 892 NW2d 794 (2017) (we give contractual terms their ordinary meaning when those terms are not defined in the contract itself) (citation omitted). The dictionary provides the legal definition of "prevail" as "to obtain substantially the relief or action sought in a lawsuit." *Merriam-Webster Online Dictionary*, <http://www.merriam-webster.com> (accessed December 20, 2019). Additionally, *Black's Law Dictionary* (11th ed) defines "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded."

Here, Bosquett successfully recovered a portion of the damages it sought in connection with the commercial lines, but recovered nothing in connection with the benefits book, personal lines, the phone bill, or prejudgment interest. Although the plain language definitions do not require Bosquett to prevail in full, Bosquett falls far short of obtaining "substantially the relief sought" in the present lawsuit. Thus, the trial court properly denied Bosquett's request for attorney fees pursuant to the APA.

Sterling argues that because the trial court erred in its amendment which increased the amount recoverable by Bosquett, it erred in granting case evaluation sanctions. We disagree. Because the trial court did not commit error, as discussed *supra*, it properly granted attorney fees as part of case evaluation sanctions pursuant to MCR 2.403(O).

## VII. CONCLUSION

We conclude that the trial court did not commit error requiring reversal when it held (1) that Bosquett was not entitled to payments in connection with the personal lines, (2) that Bosquett was entitled to payments for commissions related to the commercial lines, including the Wireless Vision account, but not for the benefits book, (3) that Bosquett was not entitled to pretrial interest, and (4) that Bosquett was entitled to reasonable attorney fees as part of case evaluation sanctions pursuant to MCR 2.403(O) but not attorney fees under the APA.

Affirmed.

/s/ Michael J. Riordan
/s/ David H. Sawyer
/s/ Kathleen Jansen